Go ahead and call the final case of the morning. Brown v. Esper, number 20-1049. Ms. Williams, you may proceed. Yes, I'm sorry, Your Honor. I think I can hear you well now. I think we're ready to go. Actually, I'm sorry, I'm not hearing you. All right. Let's do a little test here. Judge Ebell and Judge Moritz, do you want to say something and see if she can hear you? Yes. Can you hear me, Ms. Williams? Actually, Your Honor, now I can. I can hear you now. All right. Can you hear me all right? Yes, I can. All right. And I'm back on audio. Okay. You may proceed. Thank you, Your Honor. May it please the court, counsel. My name is Marisa Williams, and I represent Alfred Brown, the appellant in this case. When Congress passed the Rehabilitation Act in 1973, it made several significant findings. One of them is that millions of Americans have one or more physical or mental disabilities, and that the number of Americans with those disabilities kept increasing. It also found that disability is a natural part of the human experience, and it should not diminish an individual's right to pursue a meaningful career or enjoy full inclusion in our society. Based on these findings, Congress announced that one of our goals as a nation must be to provide disabled individuals with the tools they need to achieve equal employment, especially with respect to or equal opportunity, especially with respect to employment. As a result, they passed the Rehabilitation Act for the express purpose of expanding employment opportunities for individuals with disabilities. And importantly, one of the express purposes of Congress passing this statute was to make sure that the federal government served as a model employer, a leader for the rest of the nation with respect to employing people with disabilities. Now, this case involves the Department of Defense, specifically the Defense Health Agency, and its failure to provide our client, Mr. Alfred Brown, with the reasonable accommodations he needed. Mr. Brown served in military for 22 years. He is a veteran. He had disabilities that he received as a course of working in the military. And after 22 years, the military gave him an honorable medical discharge. But Mr. Brown wasn't finished working. He continued to work for the government as an investigator. Specifically, he worked for the U.S. Department of Justice in Illinois. He was successful there. But at some point, he decided to move his family to Colorado. He brought them here and he accepted a position with DHA, the Defense Health Agency. And it seemed like it would be a perfect job because he got to work as a fraud investigator. DHA's specific purpose is to protect the military health system. And he got to work for them and serve this country again. Incredibly, it was only when Mr. Brown began working for DHA that he experienced disability discrimination. And that is embarrassing and it is wrong. Ms. Williams, let me just, now that we've reached his job in Colorado, is it correct to say that both parties to this case agree that he was performing the essential functions of his job? Yes, Your Honor. I think that that is undisputed. He was successful. So here's my question. Has this court held that an employer must provide accommodations when an employee is performing the essential functions of his job without those requested accommodations? Yes, Your Honor. Actually, it has. Previously, even in the public sector, in the Raskin case, this court found that the private sector needed to accommodate an employee with a disability so that he could take some leave that he needed for PTSD. I'm sorry, I didn't hear you say that. What case did you say? Raskin versus US West. And more recently, Your Honor, in the XB Stolen case, this court made it very clear that a federal employer or any employer has a responsibility to ensure that their highest aspirations as employees, they are entitled to serve their highest and best purpose, and we are responsible to make sure that happens. Well, is there a disagreement, counsel, then? Because you're suggesting that he was able to perform the essential functions of his job, but he still needed some additional accommodation. But I think the problem we have here is that the was to be able to work telework primarily two days a week, and we've got the employer saying that no, that is an essential function of his job, to be in the office working with the clients, with law enforcement, working under supervision, working with the files. That's an essential function of his job. And if we agree, and the district court did, that it is an essential function of his job to be in the workplace, then how is it that he is able to... I guess I don't understand your position. If we agree that an essential function of his job is to be in the workplace, then how is it that he is able to do that? Well, first of all, Your Honor, this court should not agree that being in the workplace was an essential function. One of the primary problems in this case is that DHA as a whole encouraged telework to the maximum extent possible. It had all these things in place to allow employees to do that. And what happened here was the supervisors of a small 14-person office decided they didn't want to allow Mr. Brown the increased telework. Let me be more... Is there a more precise answer in that they had already let Mr. Brown work a day remotely, right? And so we know that they have agreed that it can't be essential to be at the And so then it's a relatively small step, I would suppose, or at least it could be argued for the purpose of disarmament judgment that it's a small step to say two days. Wouldn't that be kind of the easiest answer to that? Well, that would be, Your Honor, but the significant problem with the district court's decision was that each and every turn, it allowed two supervisors to dictate what was and wasn't a government is required to look to the agency as a whole, not just that little 14-person office to figure out whether any of the accommodations he requested were reasonable, including reassignment. I mean, if they truly felt that they couldn't allow him to telework two days a week or to try working evenings or weekends or any of the other things he requested, they could have reassigned him. They were obliged to reassign him if they truly felt they couldn't accommodate him. Well, counsel, apart from reassignment, on the question of whether it's essential to be in the office four days a week versus three days a week, how do you deal with the cases that say that some deference should be given to the employer in determining what the essential function is? Well, there are a couple of ways to deal with that, Your Honor. First of all, it is the government's or the employer's responsibility to prove that as an affirmative defense, that it's not reasonable because it's an essential function. And second of all, the cases that did find that are readily distinguishable on the facts. Mr. Brown was a high-level employee, not a clerk or a receptionist. His duties could all be accomplished from home. The agency's position description did not say he had to be physically present in the workplace to do his job. And in fact, he didn't have to be. As we all know now, given the age of corona, most people in our type of work do not have to be physically in the office at all times. So those cases are readily distinguishable. I think it was error for the court to pretty much assume that being physically present in the workplace was, in fact, an essential condition, and he certainly didn't make the government prove it. It was their burden to prove that, and they didn't. Well, let me ask you about the weekend work accommodation. Following up on what you just said, at one point, I think we've been told that Mr. Brown spends 20 to 25 percent of his time on the phone talking with law enforcement. How's he supposed to do that on the weekend? Well, first of all, Your Honor, that was Mr. O'Brien speaking off the top of his head. He never looked into it. We would submit that that was not in any way an accurate percentage of how time he had to spend talking to people. So intermittent weekend work, we're not asking for a permanent schedule of weekend work, but on occasion, to be allowed to do that would have been a reasonable accommodation. I also submit, Your Honor, that despite the fact federal employees have a weekday schedule, the simple fact is a lot of them do work on the weekends and have to work on evenings and weekends. So they could, in fact, have used this to their advantage in the PI office. Counsel, as far as the weekend work, I think you're talking now about how Mr. Brown had requested to work some of his core hours on the weekend. It's my understanding that they didn't allow core hours to be worked on the weekend, that they required you to work those within or in the building, in the actual workplace. And once you got to your 40 hours a week, basically, that you could earn credit hours or additional hours by working at home. So wasn't he really asking for something that wasn't standard, wasn't given to everyone, as you suggest in your brief, that this was something everybody got to do, work hours at home on the weekend? No, Your Honor. First of all, those two things are policy issues. It was a policy for people to not work on the weekend, and that could have been changed, which is specifically the type of thing the Rehabilitation Act says can be changed. I understand because I think that makes the same argument that you're making about teleworking. Working on the weekend, again, that raises the same issues as teleworking in the sense that you're not in the office, you're not under supervision, you're not there with law enforcement or the clients of the agency, and your files are in the office as well. What I'm asking about is, was it a policy for them to allow, generally, employees to work their core hours on the weekend? And wasn't the policy that you could only work core hours on the weekend if you already worked your 40 hours or your core hours on the weekend? You could work additional hours, I guess I should be saying. That's my understanding. Well, Your Honor, they did allow employees to work on the weekend. With respect to core hours, that's completely variable. That is simply a policy. It is not a law that they have to work those hours. Okay, I'm probably not explaining my question very well on that. Never mind that. Well, I would like to reserve some time for rebuttal, but if I can further clarify, I'm happy to do so, Your Honor. That's all right. Thank you, counsel. Ms. Prose? You need to unmute. Unmute your mic. I apologize. Thank you, Your Honor. May it please the Court, Susan Prose for the United States. Your Honors, I wanted to begin by drilling down on the very specific record evidence showing first that teleworking 40% of the time back in 2012 through July 2014 when Mr. Brown left the office would, in fact, have eliminated an essential job function and was not a plausibly reasonable accommodation as a matter of law. When you address that, that is important, but you do acknowledge they're living one day a week work at home, so then you have to show why that incremental extra day is quantitatively, not just qualitative, but quantitatively different and not acceptable, whereas one day is acceptable and what the record shows on that. All right. So, Your Honor, if I can start with the first and foremost response and key point in this evaluation, and that is that these records simply were not digitized. This was a paper world, and people could not carry these records, which contain sensitive law enforcement information, as well as protected health information, home. In fact, these records were not digitized until a new system was implemented in December of 2015, and even then, it was only a part of the files that Mr. Brown needed to do his job that were digitized. This is in the record at volume 159. I understand that, but wouldn't that have presented a problem with letting him work at one day? I don't understand if you don't have the records at home, you can't work at home, how could they have allowed him to work at home even one day then? I'm just confused. Yes. To that, Your Honor, what was happening here was that when Mr. Brown was granted the accommodation to work telework one day a week, you could do, Mr. Brown could do, minimal ancillary sorts of tasks remotely in this time frame. At that time, employees who were working remotely were not typically working on their cases or including their QI-TAM cases, which required documents on that telework day. This is in the record at volume 4, pages 786-7, 979, 1037-38, and 1044. And so, Your Honor, there is a certain indulgence that's being granted to Mr. Brown in light of his disability to take this day. But it's one thing, Your Honor, to say that you can do these ancillary sorts of duties one day a week. It's an entirely different thing to say, that you're allowed to telework 40% of the time. In short, Your Honor, the agency simply didn't- When we look at the record, we will find that 20% of his weekly work is work that did not require all these sensitive records to be taken home with him. And he could do that 20% at home, but he couldn't do 40% of it at home because he would need the records. Either we will that or we'll find that you let him work at home knowing that he really wouldn't get much done, but it was strictly a pure concession to him to try to help him. Well, Your Honor, if I understand your question correctly, I think the answer is yes to both of the points that you raised. And Your Honor, too, one critical point about not having immediate access to files is that an employee never knows. A healthcare fraud specialist would never know when that critical call from an assistant United States attorney or an FBI agent was going to come in. And even if Mr. Brown had scanned a few documents before he went home for his day of telework that week, he could not be certain that the document that he needed when that agent called would be immediately available to him. And so that's another factor in the consideration here. Isn't it relatively easy though to scan and email documents to enable telework? Your Honor, not at that time and not in these circumstances. So the managers explained that scanning documents was a huge administrative burden. These are, in many cases, these medical healthcare fraud files are in many cases three feet thick. And this is in the record, Your Honor, pages 786 and 978. So this is a matter of massive amounts of paper. And management judged that this decline in productivity simply could not be doesn't the affidavit of Ms. Frazier-Howe state that employees could access documents through VPN? Ms. Frazier-Howe's declaration does state that. She's an administrative person who was helping the agency or this office transfer at that time to implement a digitized system. But the issue here is that the VPN was not the total answer. You still had to scan the documents that you needed into that VPN. In other words, it's not a gateway, Your Honor, to all of the documents. And so it doesn't obviate or eliminate the need for excessive amounts of scanning. Well, but counsel, when you add in the testimony of Ms. Coleman, Mr. Koufal, however you pronounce it, Mr. King, who talked about teleworking, why isn't the combination of all that enough to raise an issue of fact to preclude summary judgment? Your Honor, it doesn't. The testimony that you just referenced of the three other employees discusses their opinion about telework not in this relevant time frame, not from mid-2012 to mid-2014 when Mr. Brown sought the accommodation to telework another day a week. That record testimony specifically addresses facts as they were in the record at 2015. I should say evidence as it existed in 2015 and in 2019. Are you saying that they were speaking to teleworking at and around the time of their depositions as opposed to during the relevant period of time here? Is that what we would find in the deposition testimony? Yes, Your Honor. I am making that statement. The closest that any of them come, any of those three employees come in their testimony to speaking about this relevant period that we're talking about is that Ms. Coleman says at one point, yeah, you know, you could have scanned documents back then. Of course, we acknowledge that. The issue here is that the decline in taking that much time so that Mr. Brown could telework an extra day a week on a day when he might not even have the relevant files to respond to that urgent call from law enforcement if it came. Essentially, are you suggesting that he would have had to have all of the files that he worked on scanned and have them accessible at home in order for him to be prepared to work on whatever case he had an inquiry on? He couldn't just copy a few pages on Wednesday night before he worked at home on Thursday because he didn't necessarily know what, couldn't scan them, I mean. Yes, Your Honor. That's exactly what I'm saying. This is discussed at page 1040 of the record in Volume 4 on the Record of Appeal, as well as in other places where managers talk about this need to be immediately present if such a call came in. That's at 887, 889, 911, 1040, and 1044 to 1045. Could you discuss his request for a reassignment? I'm a little bit confused about your position on that. All right, I'll begin and I'm happy to answer any questions if it's unclear, Your Honor. But first, I'd like to say this. Mr. Brown really didn't want a reassignment as that term is used in the reasonable accommodation context. So, I think it's a bit of a misnomer here. What he really wanted to do, the record shows, was handpick his supervisor and so he asked to be transferred at a few different points during this period to different teams, to different supervisors within his division. This is at pages 1080 to 83 of the record and 1404 to 1407 of the record. There would have been no change in terms of his working conditions. He would have the same job, he would have had the same second-level supervisor, Mr. Marchlowska, and he would have run smack dab into the same issues regarding digitization of documents and the weekend work issue. And, Your Honor, this Court has made clear that a reassignment, if you will, even if this were a reassignment, is an accommodation of last resort. And these circumstances here just don't fall into that last resort category. In fact, a simple request to be transferred away from a supervisor who causes you stress is unreasonable as a matter of law. And we cited cases as well as EEOC guidance on that point. And you're saying that has to be the case, that that's what he wanted because he understood that a request to transfer to a different supervisor and yet the same job, he would still be denied, he understood that he would nevertheless still be denied this accommodation he asked for. Well, he certainly would have understood, Your Honor, that he would be working under the same second-level supervisor who had been a part of the reasonable accommodation process in which these requirements, these restrictions, were laid out for him. I think the bottom line, Your Honor, here is that if Mr. Brown could do the same job for another supervisor, just across the way in the same office, he can do that job. And that doesn't qualify as a need for accommodation under the reasonable, excuse me, under the Rehabilitation Act. I appreciate your comment on that because I was a little confused by what Ms. Williams was arguing. It sounded like she was saying that she wanted an accommodation of a just a complete different job. And she was saying there's all kinds of jobs that he could have done. But the way I understood the briefing, he did not ask for that accommodation. He did not ask for doing the same kind of job. And your response was there wasn't any other supervisor that was available. Is that right? Your Honor, what you've said is correct. He didn't, we, the record shows that when Mr. Brown asked for those reassignments to other supervisors that there didn't happen to okay, if I don't have a job working on these particular kinds of claims, let me do a different job. Let me give me some wholly different job that will be less stressful. I'm not, I didn't think that that accommodation was ever specifically requested by him or that was part of the record. Am I wrong or right about that? You are right about that. We see no evidence in the record where Mr. Brown identified a specific other job, if you will, Your Honor, for which he would have been qualified and a job that he actually wanted to do. We find no evidence in the record of any specific request along those lines as Your Honor has just described. Could this be something like in Sanchez, however, where we basically said even if you can perform the essential functions of your job, the employer still has an obligation to do that something extra essentially and could that something extra here have been to transfer him to a different supervisor that he felt he felt more comfortable with? Yeah, Your Honor, I think Sanchez holds specifically something a little bit different and that is that a reassignment or a transfer to a different position, even though this is an accommodation of last resort, it may be considered in a very narrow set of circumstances not present here and that is where the employee needs that accommodation for the purposes of actually going out to obtain medical care. And so we think that that is as far as this court has gone at this time in terms of expanding this idea of when a reassignment is appropriate. But again, this is not genuinely a reassignment case. This is a transfer case. This is a transfer situation because Mr. Brown found himself to be incompatible with his supervisor, Mr. O'Brien. My time is truly at an end. If I may answer any other questions. If not, thank you. Thank you for your time. And the United States respectfully requests that the district court's order be affirmed in its entirety. Thank you so much. Thank you, Your Honor. First of all, the employees who gave testimony were talking about the time 2012 forward and we gave you the references to their testimony. Sure, by the time they were deposed, they were working full, pretty much full time off and on at home. But I provided record evidence where they said in 2012, they had that ability. Second of all, the supervisors never said that truly wasn't possible for Mr. Brown to do it. What they said was they guessed that it would be a burden. They never investigated it. Further, Mr. Brown did request reassignment. Of course, he wanted to stay doing the job he had. But the very first letter that he gave from his doctor, Dr. Madison in August of 2012, said if these accommodations are not sufficient, he may need to be reassigned to another division in TMA, which was DHA. And then each and every time he filed an EEO complaint, he said, look, they're not working with me. I just need to be reassigned out of there. So of course, he wanted to transfer to a different team, but they made it clear they weren't going to allow it. So he also requested reassignment to just somewhere else, anywhere else. And importantly, your honors, when the very first letter that the managers gave Mr. Brown talking about his accommodations, they discussed his request to go elsewhere, to work for another division. And what they said was, you are encouraged to review and apply for any vacancy within TMA. That's how they responded to his request. They put the onus on him. Did he do that? Did he apply for other vacancies? Not at that time, your honor. He thought he still had a shot of getting this worked out through the internal EEO process. Interactive obligation. If he did not apply for other vacancies, which presumably would be posted, then he could be faulted for not engaging in interactivity on that one. That is not correct, your honor. I respectfully disagree. And if I may answer, I see my time is up. But when it is a federal employer, they do have a heightened responsibility. And part of the interactive process is indeed to help the employee find another job once they express a desire to work elsewhere. That was their job and they didn't do it. So they failed in the interactive process. If I've answered your questions, your honor, I will go ahead and thank you. Thank you, counsel. The case will be submitted. Counsel are excused. We appreciate your arguments this morning.